United States District Court
District of Massachusetts

| | |
|---|---|
| United States of America, | Case No. 1:05-cr-10037-GAO |
| Plaintiff, | |
| v. | Memorandum of Reasons in Support of Motion for Reduction In Sentence Under 18 U.S.C. § 3582(c)(1)(A) |
| Jose Ruvalcaba, | |
| Defendant. | (Leave to File Granted 03/23/2020) |

## INTRODUCTION

Defendant, Jose Ruvalcaba ("Ruvalcaba"), by and through the undersigned counsel, respectfully moves this Court pursuant to 18 U.S.C. § 3582(c)(1)(A), as amended by § 603(b)(1) of the First Step Act of 2018, Pub. L. 115-391, 132 Stat. 5194, 5239 (Dec. 21, 2018), for an order reducing his sentence because he presents multiple "extraordinary and compelling reasons" for compassionate release. Ruvalcaba's life sentence was entirely driven by the life mandatory minimum pursuant to 21 U.S.C. § 851, which no longer exists. If Ruvalcaba was arrested today for the same offenses, his mandatory minimum would be 25-years because of changes imposed by the First Step Act and because one of his convictions does not qualify as a "serious drug felony." *See* P.L. 115-391, 132 Stat. 5194, at § 401 (Dec. 21, 2018). Moreover, Mr. Ruvalcaba suffers from a serious cardiac condition, which has substantially diminished his ability to provide self-care while incarcerated and has not been properly managed by the BOP. *See* U.S.S.G. § 1B1.13 and Application Notes 1(A), (B) (setting forth "extraordinary and compelling reasons" for compassionate release).

As amended by the First Step Act, this Court has jurisdiction under § 3582 to determine whether "extraordinary and compelling reasons" warrant a sentence reduction after consideration of sentencing factors under 18 U.S.C. § 3553(a), the Sentencing Commission's policy statement on reduction of sentence in U.S.S.G. § 1B1.13, and after determining Ruvalcaba is not a danger to the safety of others or the community. Because Mr. Ruvalcaba satisfies all the relevant factors, he respectfully requests the Court grant the requested sentence reduction.

## I.     Ruvalcaba Has Exhausted His Administrative Remedies

On December 21, 2018, the President signed the First Step Act into law. Among the criminal justice reforms, Congress amended 18 U.S.C. § 3582(c)(1)(A) to provide the sentencing judge jurisdiction to consider a defense motion for reduction of sentence when "the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier[.]" First Step Act of 2018, at 119.

On December 5, 2019, Ruvalcaba asked the BOP to move under 18 U.S.C. § 3582(c)(1)(A) for a reduction in sentence. (Letter to Warden, attached as Exhibit A.) The warden of FCI Butner Medium I received Mr. Ruvalcaba's request, but the BOP did not render a decision in 30 days. (Ex. A.) Therefore, Ruvalcaba has exhausted his administrative remedies. Pursuant to the authority provided by the First Step Act, Mr. Ruvalcaba now brings his request for a sentence reduction directly to this Court.

## II.      Sentence Reduction Authority Under 18 U.S.C. § 3582(c)(1)(A).

As part of the First Step Act, Congress removed a major obstacle from judicial review of sentences to determine whether "extraordinary and compelling reasons" exist that make a sentence reduction "sufficient, but not greater than necessary," under 18 U.S.C. § 3553(a). Under the Act, this Court is afforded jurisdiction to make the § 3553(a) determination of whether Ruvalcaba's almost 14 years in prison—in light of the significant changes to § 851 sentencing enhancements, Ruvalcaba's serious medical conditions, his rehabilitation, and any other reason the court deems extraordinary and compelling—is "sufficient, but not greater than necessary" to accomplish the goals of sentencing.

This Court has discretion to reduce the term of imprisonment imposed in this case if it concludes that "after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that—(i) extraordinary and compelling reasons warrant such a reduction[.]" U.S.S.G. § 1B1.13. In addition, the Court must conclude that Ruvalcaba is not a danger to the community and that a sentence reduction would be consistent with the U.S.S.G. § 1B1.13 Policy Statement.

Title 28 U.S.C. § 994 authorizes the U.S. Sentencing Commission to define "extraordinary and compelling reasons."[1] Application Note 1 to § 1B1.13 to the Sentencing Guidelines defines "extraordinary and compelling reasons" as follows:

---

[1] *See* 28 U.S.C. § 994(t) "The Commission, in promulgating general policy statements regarding the sentencing modification provisions in section 3582(c)(1)(A) of [T]itle 18, shall describe what should be considered extraordinary and compelling reasons for sentence reduction, including the criteria to be applied and a list of specific examples."

1. **Extraordinary and Compelling Reasons**.—Provided the defendant meets the requirements of subdivision (2), extraordinary and compelling reasons exist under any of the circumstances set forth below:

> (A) **Medical Condition of the Defendant**.—
> . . .
>> (ii) The defendant is—
>>> (I) suffering from a serious physical or medical condition,
>>> (II) suffering from a serious functional or cognitive impairment, or
>>> (III) experiencing deteriorating physical or mental health because of the aging process,
>>
>> that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.
>
> . . .
> (D) **Other Reasons**.—As determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C).

U.S.S.G. § 1B1.13, comment. n.1(A)(i) (emphasis added).

While the Sentencing Commission Policy Statement on reductions of sentence lists four specific categories of "extraordinary and compelling reasons" (medical condition, age of defendant, family circumstances, or other), there is no restrictive list of factors that warrant release. U.S.S.G. § 1B1.13, comment. n.1(D) ("Other Reasons" may include "reason[s] other than, or in combination with, the reasons described in subdivisions (A) through (C)".).

Notably, courts have recently found that changes to sentencing statutes amended by the First Step Act (not made retroactive), can be an "extraordinary and

compelling reason" to modify a sentence under § 3582(c)(1)(A). *See United States v. Maumau*, 2020 U.S. Dist. LEXIS 28392 (D. Utah, Feb. 18, 2020) (granting defendant's request for compassionate release and finding that changes to 18 U.S.C. § 924(c) are an extraordinary and compelling reason to modify a sentence); *see also United States v. Urkevich*, 2019 U.S. Dist. LEXIS 197408 (D. Neb., Neb. 14, 2019); *United States v. O'Bryan*, 2020 U.S. Dist. LEXIS 29747 (D. Kan., Feb. 21, 2020).  Finally, the reason for seeking a reduction in sentence "need not have been unforeseen at the time of sentencing in order to warrant a reduction in the term of imprisonment." U.S.S.G. § 1B1.13, Appl. Note 2.

### A.   This Court's Authority to Reduce Ruvalcaba's Sentence Under § 3582(c) Is Not Limited to Terminally Ill, Elderly, or Family Circumstances.

Congress first enacted the modern form of the compassionate release statute contained in 18 U.S.C. § 3582 as part of the Comprehensive Crime Control Act of 1984. Section 3582(c) states that a district court can modify a final "term of imprisonment" in four situations, the broadest of which this court can consider now: A sentencing court can reduce a sentence if and whenever "extraordinary and compelling circumstances warrant such a reduction." 18 U.S.C. § 3582(C)(1)(A)(i).  In 1984, Congress conditioned the reduction of sentences on the BOP Director filing an initial motion in the sentencing court; absent such a motion, sentencing courts had no authority to modify a prisoner's sentence for extraordinary and compelling reasons. *Id.*

Congress never defined what constitutes an "extraordinary and compelling reason" for resentencing under § 3582(c), but the legislative history indicates Congress thought the statute should be employed by federal courts. One of Congress's initial goals in passing the Comprehensive Crime Control Act was to abolish federal parole and create a "completely restructured guidelines sentencing system." S. Rep. No. 98-225, at 52, 53, n.74 (1983). Yet, recognizing that parole historically played a key role in responding to changed circumstances, the Senate Committee stressed how some individual cases may still warrant a second look at resentencing, including cases of severe illness, cases in which other extraordinary and compelling circumstances justify a reduction of an unusually long sentence, and to provide a shorter term of imprisonment. *Id.* at 55, 56. Rather than having the parole commission review every federal sentence focused only on an offender's rehabilitation, Congress decided that § 3582(c) could and would enable courts to decide, in individual cases, if "there is a justification for reducing a term of imprisonment." *Id.* at 56.

Congress intended for the situations listed in § 3582(c) to act as "safety valves for modification of sentences" that enabled sentence reductions when justified by various factors that previously could have been addressed through the (now abolished) parole system. *Id.* at 121. This safety valve would "assure the availability of specific review and reduction to a term of imprisonment for 'extraordinary and compelling reasons' and [would allow courts] to respond to changes in the guidelines." *Id.* Noting that this approach would keep "the sentencing power in the judiciary

where it belongs," rather than with the federal parole board, the statute permitted "later review of sentences in particularly compelling situations." *Id*.

Indeed, Congress intended to give federal sentencing courts an equitable power that would be employed on an individualized basis to correct fundamentally unfair sentences. Moreover, there is no indication that Congress limited the safety valve of § 3582(c)(a)(A) to terminal illness or elderly release; if extraordinary and compelling circumstances were present, they could be used to "justify a reduction of a sentence of an unusually long sentence." S. Rep. No. 98-225, at 55, 56.

**B.     The U.S. Sentencing Commission Concluded That § 3582(c)(1)(A)'s "Extraordinary and Compelling Reasons" For Compassionate Release Are Not Limited to Terminally Ill, Elderly, or Family Circumstances.**

Congress initially delegated the responsibility for determining what constitutes "extraordinary and compelling reasons" to the U.S. Sentencing Commission. *See* 28 U.S.C. § 994(t) ("The Commission . . . shall describe what should be considered extraordinary and compelling reasons for sentence reduction, including the criteria to be applied and a list of specific examples."). Congress provided only one limitation to that delegation of authority: "[r]ehabilitation of the defendant alone shall not be considered an extraordinary and compelling reason." 28 U.S.C. § 994(t). Clearly Congress limited the ability of rehabilitation alone to constitute extraordinary circumstances so that sentencing courts could not use it as a full and direct substitute for the abolished parole system. Congress, however, contemplated that rehabilitation could be considered with other extraordinary and compelling reasons sufficient to resentence people in individual cases. Indeed, the use of the

modifier "alone" signifies just the opposite—rehabilitation could be used in tandem with other factors to justify a reduction.

The Commission initially neglected its duty, leaving the BOP to fill the void and create the standards for extraordinary and compelling reasons warranting resentencing under § 3582(c)(1)(A). The Commission finally acted in 2007, promulgating a policy that extraordinary and compelling reasons include medical conditions, age, family circumstances, and "other reasons." U.S.S.G. § 1B1.13, Application Note 1(A). After a negative DOJ Inspector General report found that the BOP had rarely moved courts for a § 3582(c)(1)(A) modification, even for prisoners who met the objective criteria, the Commission amended its policy statement, expanding the guidance to courts qualifying conditions and admonishing the BOP to file motions for compassionate release whenever a prisoner was found to meet the criteria in U.S.S.G. § 1B1.13. U.S. DOJ Office of the Inspector General, *The Federal Bureau of Prisons' Compassionate Release Program* (Apr. 2013); U.S.S.G. § 1B1.13, App. Note 4; *see U.S. v. Dimasi*, 220 F. Supp. 3d 173, 175 (D. Mass. 2016) (discussing the progression from the OIG report to new "encouraging" guidelines).

The Commission created several categories of qualifying reasons: (A) medical condition of the defendant, including terminal illness and other serious conditions and impairments; (B) age of the defendant for those 65 years and older with serious deterioration related to aging who have completed at least 10 years or 75 percent of the term of imprisonment; (C) family circumstances where a child's caregiver or

spouse dies or becomes incapacitated without an alternative caregiver; and (D) "other reasons." U.S.S.G. § 1B1.13(1).

Under subdivision D, a sentence may be reduced if,

[a]s determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C).

Consistent with the text and legislative history of § 3582(c), the Commission concluded that reasons beyond medical, age and family circumstances could qualify as "extraordinary or compelling reasons" for resentencing, and the extraordinary or compelling reasons need not be based on changed circumstances occurring after the initial sentencing of the defendant. U.S.S.G. § 1B1.13, Appl. Note 2.

## C. Congress Changed the Process for Compassionate Release Through the First Step Act Based on Criticism of the BOP's Inadequate Use of Its Authority, Returning to the Federal Judiciary the Authority To Act On Its Own To Reduce Sentences For "Extraordinary and Compelling Reasons."

Prior to Congress passing the First Step Act, the U.S. Sentencing Commission set the criteria for relief under § 3582(c), and the only way a court could reduce a sentence was if the BOP Director initiated and filed a motion in the sentencing court. *See* P.L. 98-473 (H.J. Res. 648), P.L. 98-473, 98 Stat. 1837 (Oct. 12, 1984). Even if a federal prisoner qualified under the Commission's definition of extraordinary and compelling reasons, without the BOP filing a motion, the sentencing court had no authority to reduce the sentence and the prisoner was unable to secure a sentence reduction.

Leaving the BOP Director with ultimate authority for triggering and setting the criteria for sentence reductions created several problems. The Office of the Inspector General (OIG) found that the BOP failed to provide adequate guidance to staff on the criteria for compassionate release, to set time lines for reviewing compassionate release requests, to create formal procedures for informing prisoners about compassionate release, and to generate a system for tracking requests. *See FBOP Compassionate Release Program*, at i, iv.  The OIG concluded that "FBOP does not properly manage the compassionate release Program, resulting in inmates who may be eligible candidates for release not being considered." *Id.*; *See, generally*, Stephen R. Sady & Lynn Deffebach, *Second Look Resentencing Under 18 U.S.C. § 3582(c) as an Example of Bureau of Prisons Policies in Overincarceration*, 21 FED. SENT. RPTR. 167 (Feb. 2009).

Congress heard those complaints.  On December 21, 2018, Congress passed the First Step Act, part of which transformed the process for compassionate release under § 3582(c)(1)(A).  Congress labeled these changes, "Increasing the Use of Transparency of Compassionate Release."  164 Cong. Rec. H10346, H10358 (2018).

Federal judges have the power to order reductions of sentences even in the face of BOP resistance or delay. The legislative history establishes that Congress intended the judiciary not only to take on the role that the BOP once held as the essential adjudicator of compassionate release requests, but also to grant sentence reductions on the full array of grounds reasonably encompassed by the "extraordinary and compelling" standard set forth in the statute.

**D.    Statutory Text Defines Judicial Sentence Reduction Authority Around "Extraordinary and Compelling Reasons," and the Policy Statements of the U.S. Sentencing Commission Under § 1B1.13 Do Not Preclude This Court from Resentencing Ruvalcaba.**

Once a prisoner has properly pursued administrative remedies and filed a motion for compassionate release, a federal court possesses authority to reduce a sentence if and whenever the Court finds "extraordinary and compelling reasons warrant such a reduction." A court must consider the 18 U.S.C. § 3553(a) sentencing factors in reducing any sentence, and any reduction of a sentence that a court orders must also be "consistent with applicable policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A).

The BOP's dependence on Commission policy statements is now inconsistent with the First Step Act's amendment of § 3582(c)(1)(A). Application Note 1(D) can no longer limit judicial authority to cases with an initial determination by the BOP Director that a prisoner's case presents extraordinary or compelling reasons for a reduction because the First Step Act allows courts to consider and grant sentence reductions even in the face of an adverse or unresolved BOP determination. *See* 18 U.S.C. § 3582(c)(1)(A), as amended by P.L. 115-391, § 503 (12021-18).

The Commission's now-dated statement—indicating that the BOP must file a motion in order for a court to consider a compassionate release sentence reduction—no longer controls in the face of the new statutory text, which explicitly allows a court to consider a reduction even in the absence of the a BOP motion. *Id*. With the First Step Act, Congress decided that federal judges are no longer constrained or controlled

by how the BOP Director sets its criteria for what constitutes extraordinary and compelling reasons for a sentence reduction. Consequently, those actions of the Application Notes requiring the BOP determination or motion are not binding on courts. *Stinson v. United States*, 508 U.S. 36, 38 (1993) ("We decide that commentary in the Guidelines Manual that interprets or explains a guideline is authoritative unless it violates the Constitution or a federal statute, or is inconsistent with, or plainly erroneous reading of, that guideline."). Now that the First Step Act has recast the procedural requirements for a sentence reduction, even if a court finds there exists an extraordinary and compelling reason for a sentence reduction without the BOP Director's initial determination, then the sentence reduction is not inconsistent "with the applicable policy statements issued by the sentencing commission."18 U.S.C. § 3582(c)(1)(A).

## III.   Procedural History.

On March 16, 2006, Ruvalcaba was arrested and detained in federal custody. (Doc. No. 3.) On May 11, 2006, he was charged in a three-count Second Superseding Indictment for conspiracy to distribute and possession with intent to distribute methamphetamine in violation of 21 U.S.C. § 846, and conspiracy to launder money in violation of 18 U.S.C. § 1956(h). (Doc. No. 55.) On June 30, 2006, the government filed an Information to Establish Prior Conviction pursuant to 21 U.S.C. § 851 notifying Ruvalcaba of enhanced penalties under 21 U.S.C. § 841(b). (Doc. No. 72.) On May 5, 2008, following a jury trial, he was found guilty on the above counts and

sentenced to life imprisonment. (Doc. Nos., 222, 287.) He is currently incarcerated at

FCI Butner Medium I; he is 45 years old.[2]

## VI. Ruvalcaba's "Extraordinary and Compelling Reasons" Warrant A Reduction in Sentence Under 18 U.S.C. § 3582(c)(1)(A).

### A. Changes to the § 851 Sentence Enhancement, As Amended by the First Step Act, Constitute An "Extraordinary and Compelling Reason."

Mr. Ruvalcaba's sentence of life imprisonment was entirely driven by the

mandatory minimum required under 21 U.S.C. § 851; if he was arrested today for the

same offenses, the sentence enhancement would result in a significantly lower

sentence because of changes imposed by the First Step Act, including the changes to

the mandatory minimum sentences and the offenses that qualify as a "serious drug

felony."

### 1. Changes to § 851 under the First Step Act.

The First Step Act reduced certain enhanced mandatory minimum penalties

for some drug offenders and the conditions under which they apply. P.L. 115-391, 132

Stat. at 5220, at § 401(a)(2)(A)(ii). For a defendant's prior convictions to apply, they

must meet the new definition of "serious drug felony":

> An offense prohibited by 18 U.S.C. § 924(e)(2)(A) for which the
> defendant served a term of imprisonment of more than 12 months and
> was released from any term of imprisonment within 15 years of the
> instant offense. Section 924(e)(2)(A) defines "serious drug felony" as an
> offense under the Controlled Substances Act (21 U.S.C. § 801 *et seq.*),
> the Controlled Substances Import and Export Act (21 U.S.C. § 951 *et
> seq.*), Chapter 705 of Title 46 (Maritime Law Enforcement) or under
> state law, involving manufacturing, distributing, or possessing with

---

[2] Information obtained via the Inmate Locator feature of the BOP website
www.bop.gov (last visited January 14, 2020).

intent to distribute, a controlled substance (as defined in section 102 of the Controlled Substances Act (21 U.S.C. § 802)), for which a maximum term of imprisonment is ten years or more.

U.S.S.G., Office of Education & Sentencing Practice, *First Step Act* (Feb. 2019), *available at* https://www.ussc.gov/sites/default/files/pdf/training/newsletters/2019-special_FIRST-STEP-Act.pdf. One of Ruvalcaba's two prior offenses does not meet this definition; he only has one prior "serious drug felony."

Congress failed to make the changes to § 851 retroactive to sentences imposed before the passage of the First Step Act. *See* P.L. 115-391, 132 Stat. 5194, at § 401. Therefore, individuals serving sentences with a § 851 enhancement seeking relief under §3582(c)(1)(A) must establish extraordinary and compelling reasons individually to be eligible.

That Congress chose to foreclose one avenue for relief does not mean it chose to foreclose all means of redressing draconian sentences imposed under § 851. Indeed, Congress's decision to pass prospective-only changes to § 851 *does not* prevent this Court from resentencing Ruvalcaba under the compassionate release statue based on individualized extraordinary and compelling reasons.

### 2. Under amended § 851, Ruvalcaba would not face mandatory minimum sentence of life in prison.

Ruvalcaba received a life sentence under a statutory provision that Congress has since found too punitive. *See* 21 U.S.C. § 851, as amended by P.L. 115-391, 132 Stat. 5194, at § 401 (Dec. 21, 2018). If sentenced today, one of Ruvalcaba's prior convictions would not qualify as a "serious drug felony" and he would face a mandatory minimum of 15 years. However, even if it did and he had two prior serious

drug felonies, he would face a mandatory minimum of 25 years imprisonment, far less than the life sentence he received.

Ruvalcaba's sentencing enhancement was based on two prior convictions in California state court: (1) possession of methamphetamine (Case No. KA052624), and (2) sale and distribution of methamphetamine in 2001 (Case No. R1F096624). (Doc. No. 72.) However, in 2014 California passed Proposition 47, which retroactively deemed certain state convictions as misdemeanors. CA Penal Code § 1170.18 *et seq*. As a result, Mr. Ruvalcaba's prior possession conviction was amended to a misdemeanor and it would no longer qualify as a "serious drug felony" for purposes of the § 851 enhancement because it is punishable by a term of imprisonment for one year—not the ten years required by statute. Therefore, Ruvalcaba has one prior conviction for a "serious drug felony" not two.

Moreover, the First Step Act changed the mandatory minimum penalties for repeat offenders.

| Calculation of How Jose Ruvalcaba's Sentence Would Be Substantially Lower If Imposed Today | | |
| --- | --- | --- |
| | Original Sentence | Sentence AFTER First Step Act |
| Statutory Range 21 U.S.C. 841(b)(1)(A) | 20-year mandatory minimum (after one prior conviction for a "felony drug offense") <br><br> Life (after two or more prior convictions for "felony drug offense") | 15-year mandatory minimum (after one prior conviction for a "serious drug felony") <br><br> 25-year mandatory minimum (after two or more prior convictions for a "serious drug felony") |

With only one qualifying "serious drug felony," Mr. Ruvalcaba would be facing a mandatory minimum sentence of 15 years. Moreover, even with two prior serious

drug felony convictions, Ruvalcaba would be facing a mandatory minimum of 25 years—not life imprisonment.

With the passage of the First Step Act, Congress concluded that punishments arising from § 851 sentencing enhancements were punitive and unfair. Nowhere is that more apparent than in this case. Ruvalcaba is a 45-year old man who has been imprisoned for almost 14 years and will currently spend the rest of his life in prison for offenses that would, at most, require a mandatory sentence of 25 years. The grave sentence disparity that now exists in this case because of changes under the First Step Act presents an extraordinary and compelling reason and warrants a sentence reduction in this case.

### 3.   Changes to mandatory sentencing laws constitute an "extraordinary and compelling reason" for compassionate release.

The First Step Act amended § 851 and sentencing for offenses under 18 U.S.C. § 924(c), but it did not make those changes retroactive. However, recent court decisions have held that changes in sentencing, specifically calculating § 924(c) sentences, "is a compelling and extraordinary reason to provide relief." *Maumau*, 2020 U.S. Dist. LEXIS 28392, at *16.

In *Maumau*, the defendant was sentenced to 57 years (later reduced to 55 years) as a result of the harsh mandatory minimum sentencing scheme under § 924(c). *Id.* at *1, *10–11. He filed a motion to reduce his sentence under 18 U.S.C. § 3582(c)(1)(A) arguing for consideration based on his age at the time he committed the

offense, length of sentence imposed, and changes made by Congress that reduced sentencing guidelines applying to his crimes. *Id*.

The court joined the majority of courts in concluding that it "has the discretion to provide Mr. Maumau with relief, even if his situation does not directly fall within the Sentencing Commission's current policy statement." *Id*. at *10.

The court also reiterated that compassionate release could be granted to correct sentences: "Congress indicated thirty-five years ago that it would be appropriate to provide compassionate releases when sentences are 'unusually long.'" *Id*. at *13–14. "[T]he fact that the phrase 'extraordinary and compelling reason' has not historically been interpreted to include exceedingly long sentences is an unpersuasive reason to exclude such an interpretation today." *Id*. at *14.

Mr. Maumau was serving a sentence that was 40 years longer than the sentence he would have received under the revised § 924(c). Ultimately, the court concluded that it could modify Maumau's sentence based on changes to § 924(c), even if they were not made retroactive, because it is an extraordinary and compelling reasons to provide relief. The government in *Maumau* argued against a sentence reduction because Congress chose not to make the changes to the statute retroactive; the court disagreed because "[i]t is not unreasonable for Congress to conclude that not <u>all</u> defendants convicted under § 924(c) should receive new sentences, even while expanding the power of the courts to relieve <u>some</u> defendants of those sentences on a case-by-case basis." *Id*. at 16–17.

While Ruvalcaba was not impacted by the harsh scheme under § 924(c), the reasoning and conclusions in *Maumau* are instructive in this case. Like Mr. Maumau, Ruvalcaba was young at the time of his sentencing and he is facing an incredibly long term of incarceration—life. *See id.* at *17. Most importantly, if Ruvalcaba was sentenced today, he would not be subject to life in prison; he would be facing, at most, a mandatory minimum sentence of 25 years. As in *Maumau*, these factors present extraordinary and compelling reasons to reduce Ruvalcaba's sentence.

Other courts have also reduced defendants' sentences on the basis of the harsh sentences imposed under the prior version of § 924(c) and concluded that while the First Step Act does not automatically entitle a defendant to resentencing under § 924(c) (or § 851 in this case), "it does not mean that the court may not or should not consider the effect of a radically changed sentence for purposes of applying § 3582(c)(1)(A)." *O'Bryan*, 2020 U.S. Dist. LEXIS 29747, at *3; see also *Urkevich*, 2019 U.S. Dist. LEXIS 197408. This court has the authority to reduce Ruvalcaba's sentence because the unfair sentence imposed under the old version of § 851 would require him to remain incarcerated for the remainder of his life, decades longer than Congress now deems warranted for the crimes he committed.

## B.   Ruvalcaba's Serious Medical Conditions Present "Extraordinary and Compelling Reasons."

Ruvalcaba also presents "extraordinary and compelling reasons" warranting a reduction in his sentence because he has serious physical and medical conditions that he will never recover from, and he has substantial diminished ability to provide self-

care in a correctional facility environment within the meaning of the Application Note 1(A)(ii) of U.S.S.G. § 1B1.13.

### 1.    Ruvalcaba's serious medical conditions.

In 2005, Ruvalcaba was diagnosed with congestive heart failure, cardiomyopathy, and severe left ventricular dysfunction. (BOP Medical Records – Part 1 attached at Exhibit B, at 172–177; BOP Medical Records – Part 2 attached as Exhibit C.).[3] He has a history of heart attacks and strokes and an internal defibrillator was implanted in 2006; his physician prior to incarceration stated that Ruvalcaba would require a heart transplant. (Doc. No. 367-5.). While his device was explanted in 2014, recent testing since 2017 shows his heart function is again decreasing and he requires regular, comprehensive monitoring and treatment for his condition. (Ex. B, at 152, 167–168, 170, 172–177, 184.). Unfortunately, the BOP has not provided adequate care for Mr. Ruvalcaba.

There have been multiple instances where proper follow-up with a cardiologist has not been completed. Between February 2011 and March 2012, over one year lapsed before he was seen by a cardiologist, with the BOP noting he "was supposed to be reevaluated around Aug/2011 but has not happened." (Ex. C, at 129, 131.) During that time, Ruvalcaba still had his pacemaker implanted and it was not being checked. Mr. Ruvalcaba also did not receive any cardiac follow-up from 2014 to 2017. (Ex. B, at 152, 172.) While his heart failure was in "remission" and his

---

[3]    Exhibits B and C are Ruvalcaba's medical and psychological records. Consistent with this Court's ECF Procedures, these documents will be submitted to the Court in paper form only.

cardiomyopathy had "improved," his ejection fraction decreased again approximately 10 to 15 percent during that time after his device had been removed—but no one was paying attention. (Ex. B, at 172.) Ruvalcaba's own family also wrote to the BOP in 2010 complaining about the lack of acceptable medical care he was receiving. (Ex. C, at 305–311.) These lapses in care are unacceptable given his complicated cardiac history and history of defibrillator placement. (Ex. B, at 152, 172.)

Mr. Ruvalcaba suffers from a serious cardiac condition and his ability to provide self-care in a correctional facility is substantially diminished. Mr. Ruvalcaba's heart function had improved at one point, but it is clear he will never fully recover from this condition and will require regular medication and other serious medical interventions in the future; proper treatment and management would alleviate symptoms and complications and extend his life. The most effective manner for managing Ruvalcaba's conditions and ongoing physical decline is outside of a correctional facility.

Compassionate release would afford Mr. Ruvalcaba the opportunity to seek medical care outside the BOP system, which is not only the most effective manner of treatment, but also the most efficient and least expensive.

Ruvalcaba has also been diagnosed with hyperlipidemia and hypertension, which require regular monitoring and treatment. (Ex. B, at 26–27.) These conditions will continue to worsen as he ages and make providing self-care difficult. Ruvalcaba is taking the following prescription medications: Atorvastatin (hyperlipidemia), amlodipine (hypertension), Carvedilol (hypertension, secondary cardiomyopathy,

heart failure), bethamethasone ointment (dermatitis), fluocinonide ointment (dermatitis), lisinopril (hypertension). (Ex. B, at 26–27.)

Ruvalcaba's medical conditions require frequent treatment from outside medical providers because the BOP cannot provide the procedures and monitoring required to provide consistent and thorough management of his conditions. A correctional facility environment simply does not provide the safe and sanitary conditions required to manage Ruvalcaba's conditions, nor the necessary access to care and the monitoring his conditions require. While the BOP may argue that Ruvalcaba's conditions can be adequately managed in a correctional facility, his medical history tells a different story.

### 2.    Judicial support for compassionate release.

Until recently, judicial decisions addressing compassionate release were few and far between and only since the passing of the First Step Act are starting to shed light on the types of conditions that may qualify a person for release. A May 2019 case from the Southern District of Indiana and 2016 case from the District of Massachusetts support, by way of analogy, relief in Ruvalcaba's case. *See U.S. v. McGraw*, 2019 WL 2059488 (S.D. Ind., May 9, 2019); *U.S. v. DiMasi*, 220 F. Supp. 3d 173 (D. Mass. 2016).

In *McGraw*, the defendant was sentenced to life in prison for conspiracy to possess with intent to distribute methamphetamine and had served approximately 17 years in prison. *McGraw*, 2019 WL 2059488 at *1, 5. McGraw requested compassionate release based on his deteriorating physical condition; he used a

wheelchair and walker to ambulate short distances, required portable oxygen, and has other conditions including diabetes, peripheral neuropathy, hypertension, emphysema, and chronic kidney disease. *Id*. at *2. His diabetes and hypertension were well-controlled during incarceration. *Id*. McGraw also "suffered from bouts of severe, uncontrollable diarrhea." *Id*.

The Indiana federal district court made a number of relevant findings that are helpful in the case at hand. First, Application Note (1)(A)(ii) does not require that a person is "unable to function" in prison, only that they "have substantially diminished ability to provide self-care within the correctional facility environment." *Id*. at *3. Second, while McGraw's diarrhea was "stabilized" it was far from "resolved" and his other "conditions require frequent monitoring, evaluation, and treatment." *Id*. at *4. Third, while some of McGraw's conditions were "'controlled,' 'well-managed,' or 'stabilized'—these terms all indicate a need for active monitoring and treatment." *Id*. Fourth, McGraw was dependent on oxygen and a wheelchair. In sum, the court concluded that the defendant's "chronic, serious conditions, including those that are mitigated when properly treated by medical professionals, demonstrate a substantially diminished ability to provide self-care from which he is not expected to recover. Extraordinary and compelling reasons therefore support a reduction in sentence." *Id*.

In *DiMasi*, the defendant was sentenced to eight years in prison for extortion and related crimes he committed while he was the Speaker of the Massachusetts House of Representatives. *Id*. at 174. In this case, the district court concluded that

compassionate release was appropriate based on DiMasi's cancer and injuries resulting from his radiation treatments. *Id.* at 175–77. He had esophageal narrowing, which was not a terminal illness and did not impair his functioning, however it did impact his ability to swallow. *Id.* at 176–77. The court found it to be a serious medical condition because DiMasi required monitoring while eating to prevent chocking or aspiration of food particles (which could lead to pneumonia); this monitoring could be more effectively performed by family or hired professionals and not another inmate. *Id.* Furthermore, releasing DiMasi "w[ould] also serve the interest of providing him with the *most effective medical treatment* in another way." *Id.* at 177. It would also give him "the liberty of selecting the doctors and hospitals he wants to treat him, and will have the opportunity to obtain what may be better medical care than he would if he remained in custody." *Id.*

As in *McGraw* and *DiMasi*, Ruvalcaba's conditions are serious and chronic and constitute "extraordinary and compelling reasons" for reduction of his sentence under 18 U.S.C. § 3582(c)(1)(A). These conditions are clearly contemplated as grounds for compassionate release. *See* U.S.S.G. § 1B1.13, Appl. Note 1(A)(ii).

Further, Ruvalcaba's other conditions like hypertension, hyperlipidemia, and history of serious cardiac diagnoses indicate a need for active monitoring and treatment. For example, Ruvalcaba's hypertension was noted to be "suboptimally controlled" and he requires frequent blood pressure checks. (Ex. B, at 172.)

As discussed earlier, there have also been multiple instances where proper follow-up has not been completed: from 2011 to 2012, he was not seen by a

cardiologist, with the BOP noting he "was supposed to be reevaluated around Aug/2011 but has not happened." (Ex. C, at 131.) Mr. Ruvalcaba also did not receive any cardiac follow-up from 2014 to 2017. (Ex. B, at 152, 172.) The BOP's failure to provide adequate follow-up for almost four years between 2011 and 2017 demonstrates a clear inability to offer proper care. As demonstrated below, such a sentence reduction is consistent with, and indeed supported by, the 18 U.S.C. § 3553(a) factors whose consideration is mandated by § 3582(c)(1)(A) "to the extent they are applicable."

### C. With Full Consideration of the § 3553(a) Factors, Ruvalcaba's Time Served Constitutes A Sentence Sufficient but Not Greater Than Necessary to Accomplish the Goals of Sentencing.

Under § 3553(a), the extraordinary and compelling reasons warrant sentence reduction based on the characteristics of Ruvalcaba, the need for an effective and supportive environment for medical care, and the accomplishment of the deterrence and public safety purposes of sentencing. The time already served has met the original sentencing goals.

#### 1. History and characteristics of the defendant.

Since sentencing, Ruvalcaba's "history and characteristics" have changed. *See* 18 U.S.C. § 3553(a)(1). In terms of his "history and characteristics" Ruvalcaba is 45 years old and his medical conditions have again begun to worsen in severity. His cardiac health will only continue to deteriorate as he ages, and he will require significant medical intervention in the future to treat his cardiomyopathy. (*See supra*, Section IV.)

### 2. Ruvalcaba needs to be able to seek independent medical care.

If Mr. Ruvalcaba had any control over his medical care, he would not experience any delays in seeking medical attention like he has experienced repeatedly in the past. He would have access to regular and proper therapies to delay and prevent complications resulting from his conditions, and have access to proper monitoring of his conditions. Ruvalcaba's heart health has been declining since 2017 (and possibly even sooner, but we will never know because the BOP failed to adequately monitor his condition for almost a three-year period). Testing shows worsening ejection fraction, decreased left ventricular function, dilated left ventricle, and an anterior septal defect. (Ex. B, at 148–152, 172–177, 184.) His health has and will continue to deteriorate, and he will require significant medical intervention to address this issue. The Court must now consider the need "to provide [Ruvalcaba] with . . . medical care . . . in the most effective manner." 18 U.S.C. § 3553(a)(2)(D).

The BOP is likely to claim it is capable of providing adequate medical care and treatment for Ruvalcaba but that claim seems unlikely given the complexities associated with Ruvalcaba's conditions and the documented history of failures by the BOP in in managing his care.

Commentators have found significant issues with the BOP's provision of medical care. Medical staffing shortages, treatment delays, and medical personnel

recruiting issues plaguing the BOP,[4] and treatment in the community would be more efficient, timely, and less burdensome on the BOP's medical costs—these facts all weigh heavily in favor of reducing Ruvalcaba's sentence. Ruvalcaba's own BOP medical records state that "Due to shortages in MLP's and physicians, I am renewing inmate's medication orders until he/she can be seen for their chronic care." (Ex. B, at 360.) Given the frequency with which Ruvalcaba's medications need to be adjusted and the close monitoring of his heart health, simply renewing medications because of staffing shortages is irresponsible and potentially dangerous.

As an inmate, Ruvalcaba cannot select his doctor or seek out the specialized medical services and treatments his conditions require. If granted compassionate release, Ruvalcaba would have the option to receive regular medical care and therapy in the surrounding community, and the opportunity to seek out treatments that are simply unavailable through the BOP. Compassionate release and treatment outside of a correctional environment is not only the most effective manner of treatment, it would also be the most efficient and least expensive. However, that is not the sole reason for reexamining § 3553(a)(2)(D).

Even if the BOP can provide competent care, Ruvalcaba's conditions are "extraordinary" under § 3553(a)(2)(D) and he is entitled to "the most effective manner" of treatment. In the Eighth Circuit case of *United States v. Wadena*, 470 F.3d 735 (8th Cir. 2006), the court recognized that while the defendant inmate could

---

[4] Erica Zunkel, *18 U.S.C. § 3553(a)'s Undervalued Sentencing Command: Providing a Federal Criminal Defendant with Rehabilitation, Training, and Treatment in "the Most Effective Manner,"* 9 NOTRE DAME JOURNAL OF INT'L LAW 49, 61 (2019).

obtain dialysis treatments and medical care in prison, "[18 U.S.C.] § 3553(a)(2)(D) explicitly states that the effective provision of necessary medical care is an appropriate factor for the district court's consideration in sentencing." *Id*. at 739. Moreover, "[t]he district court had the discretion to decide that it would be more efficient and effective for [the prisoner] to receive treatment from his current healthcare provider." *Id*.

As an inmate, Ruvalcaba is not "entitled" to the doctor of his choosing and he cannot schedule timely appointments or much-needed treatments and therapy to slow the progression of his deteriorating health. In this case, the most efficient and effective treatment for Ruvalcaba is at home where he can be supported by loved ones to enhance his treatment and where he can seek out expert medical care in the community. Upon release, Mr. Ruvalcaba would have the support of numerous friends and family as evidenced by the letters of support, attached herein as **Exhibit D**.

If this court were to reduce Mr. Ruvalcaba's sentence, he would reside in Pico Rivera, California with his fiancée. He would be able to independently support himself by working at Mobile Rod Solutions in Rancho Cucamonga, California. He would receive overwhelming support as evidenced by the numerous letters of support.

### 3. Ruvalcaba is not a threat to public safety and time served accomplishes deterrence.

Reducing Ruvalcaba's sentence or resentencing him based upon the revised § 851 enhancements and his medical conditions would not disserve the factors set out in 18 U.S.C. § 3553(a)(2)(A) (the need for the sentence imposed "to reflect the

seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense" of conviction), 18 U.S.C. § 3553(a)(2)(B) (the need for the sentence imposed "to afford adequate deterrence to criminal conduct"), and 18 U.S.C. § 3553(a)(2)(C) (the need for the sentence imposed "to protect the public from further crimes of the defendant").

Ruvalcaba has served almost 14 years in prison for his offenses. During that time, he has been a model inmate and completed significant courses to better himself.

Ruvalcaba has expressed sincere remorse for his crimes and has demonstrated through his actions that he can be a law-abiding citizen. Ruvalcaba's request that his sentence be consistent with current sentencing guidelines will not minimize the seriousness of Ruvalcaba's offenses and will provide just punishment and adequate general deterrence—he has already spent 14 years in prison.

### 4.     Ruvalcaba's sentence is significantly greater than others similarly charged.

Ruvalcaba is serving a life sentence for offenses that if committed today, would yield a dramatically different result. Rather than life imprisonment, Ruvalcaba would be facing a 15 or 25-year mandatory minimum and he would be preparing for life outside of a correctional facility environment. He would have the opportunity to integrate into society and play an active role in his family's lives, demonstrate his commitment to be a law-abiding citizen, and prove that he is truly rehabilitated.

**D.      Ruvalcaba Is Not A Danger to the Safety of Any Other Person or to the Community.**

Ruvalcaba would pose no danger to the community or other persons. He has no history of violence and his recent risk assessment provides that his recidivism risk level is low. While most people in Mr. Ruvalcaba's position may have been crushed under the weight of serving a life sentence, he has not given up.  Rather, Ruvalcaba has a documented history of positive change while incarcerated and has strived to improve his relationships with family and continued to educate himself. Should he be granted compassionate release, he hopes to become involved with the Youth Association, mentoring and teaching about the negative consequences of drug use. This would allow Ruvalcaba the opportunity to share his experiences and give back to his community. He is also interested in volunteering with the elderly, homeless, Boys and Girls Club, and with Alcoholics and Narcotics Anonymous programs.

During his incarceration, Ruvalcaba made significant contributions to the Challenge Program's Modified Therapeutic Community at USP Tucson. (Ex. E, at 1.) As the letter notes, he has remained discipline free and has "consistently demonstrated that he is dependable and responsible. His reliability is exemplary and his maturity a community asset." (Ex. E, at 1.) He also served as an inmate Suicide Prevention Companion.

Enclosed in Exhibit E, you will also find a letter addressed to Judge O'Toole (Ex. E, at 2–3.) which discusses Mr. Ruvalcaba's remorse and commitment to positive change, as well as certificates of completion for various courses (ranging from drug education programs, to health and life skills courses).

Lastly, individuals "released under compassionate release have [a] 3.5% recidivism rate, the lowest among all those formerly incarcerated."[5] Ruvalcaba would pose no danger to the community or other persons. He is a 45-year old man with no history of violence. During his incarceration, Ruvalcaba has demonstrated excellent participation in programming and a commitment to rehabilitation. He has close ties with his family, and he poses no threat to public safety.

### E.   Sentence Reduction is Consistent With § 1B1.13 Policy Statement.

A reduction in Ruvalcaba's sentence is consistent with the U.S.S.G. § 1B1.13 Policy Statement because he presents with multiple "extraordinary and compelling reasons" warranting a reduction in sentence. First, he is suffering from serious physical and medical conditions that substantially diminish his ability to provide self-care while in a correctional facility environment and these conditions are such that he will not recover; the BOP has demonstrated they are incapable of managing Ruvalcaba's complex medical history. *See* U.S.S.G. § 1B1.13, Application Note 1(A); s*upra*, Section IV–V.  Second, the changes to § 851, Ruvalcaba's existing life sentence, and his record of rehabilitation are extraordinary and compelling reasons to warrant a reduction in sentence. *See* U.S.S.G. § 1B1.13, Application Note 1(D); s*upra*, Section IV–V. Indeed, there are extraordinary and compelling reasons to warrant a reduction in Ruvalcaba's sentence consistent with the § 1B1.13 Policy Statement.

---

[5] https://www.schatz.senate.gov/download/compassionate-release-letter-2017 (last accessed January 14, 2020).

**VII.    Conclusion.**

Mr. Ruvalcaba presents extraordinary and compelling reasons in support of a reduction in his sentence. If he were sentenced today, he would be a 45-year old man working towards rebuilding a future outside of a correctional environment; however, without compassionate release, he will die in prison.

Mr. Ruvalcaba has clearly and repeatedly demonstrated remorse for his crimes and the ability to rehabilitate, and the fact that changes to sentencing enhancements were not retroactively applied by Congress does not foreclose the option to reduce Ruvalcaba's sentence based on extraordinary and compelling reasons as evidenced by recent court decisions. For the foregoing reasons, Ruvalcaba respectfully requests that the Court grant a reduction in sentence to time served.

Respectfully submitted,

/s/Brandon Sample
Brandon Sample
Brandon Sample PLC
P.O. BOX 250
Rutland, VT 05702
Tel: 802-444-4357
Fax: 802-779-9590
E-mail: brandon@brandonsample.com
https://compassionaterelease.com

*Counsel Pro Hac Vice for Jose Ruvalcaba*

## **CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing was served this 23rd day of March, 2020, via CM/ECF on all counsel of record.


<u>/s/Brandon Sample</u>
Brandon Sample